HOUSTON, Justice.
In January 1999, Nancy A. Sims, acting on her own behalf and also through Dorothy A. Watts, Charles W. Sims, and J. Eugene Sims, as her attorneys-in-fact, filed a declaratory action against Miles E. White, Ashley L. White, and Robert Warren Thompson (hereinafter collectively referred to as “the Whites”). In this declaratory action, Sims asked the trial court to declare that she had the right to cut and remove all merchantable pine timber, which was 12 inches in diameter at breast height and larger, from certain real property located in Baldwin County, to-wit:
“East Half of the Southeast Quarter of Section 3, Township 1 South, Range 3 East.”
After conducting a trial, the court entered a judgment declaring that Sims had the right to cut and remove all merchantable pine timber 12 inches in diameter at breast height and larger, from the above-described land. The Whites filed a motion to alter, amend, or vacate the judgment, which was denied. The Whites appealed.
The evidence was presented ore tenus, and the trial judge found for Sims. Considered in the light most favorable to Sims, as our standard of review requires us to consider them, the facts appear as follows: Beginning at a time before 1952, Sims and her husband, James Alonzo Sims, accumulated a tract of rural land, totaling 1,600 acres, located near Bay Minette in Baldwin County. Most of the land was used for growing timber, and, from 1952 until his death in 1963, James managed the land for cutting timber. At one time, they clear-cut and replanted one 40-acre tract. After James’s death, Sims (who was then the sole owner of the land) continued with the timber-management practices started by her husband.
With professional assistance, Sims conducted a regular rotating timber-cutting operation on different parts of the 1,600 acres. One operation on a 40-acre tract cut all timber larger than nine inches in diameter. Other operations cut storm-damaged timber as needed for salvage. The usual practice was to cut timber 12 inches and larger in diameter. According to Neil Crosby, a registered forester, Sims’s management plan was to always leave a stand of seed trees after each harvest; this was a plan Crosby recommended. Mark Loper, who had worked for Crosby, testified that Sims had managed the property as a tree farm. Keville Larson, a consulting forester with an impressive résumé, inspected the Sims property, interviewed Sims’s foresters and her children, and consulted various literature defining tree farms and concluded that the Sims property was a tree farm.
*330 Sims and her husband had four children, Dorothy Sims Watts, Charles Wilson Sims, James Eugene Sims, and Dorice Sims Thompson. After James’s death, Sims deeded various parcels of the property to her four children. At trial, Charles Wilson Sims testified that although his mother had conveyed portions of her real property to various family members, there was an understanding among the family members that she had retained the right to cut and remove the timber growing on the property and to receive the income from the sale of the timber.[1]
In December 1972, Sims conveyed fee simple title to the property involved in this case (hereinafter referred to as “the subject property”) to her daughter, Dor-ice.[2] In December 1974, Dorice and her husband executed to Sims a deed giving her a life estate in two parcels of property that had been deeded to Dorice, including the subject property. In November 1992, Dorice conveyed the subject property to her son Robert Warren Thompson. In August 1998, the December 1974 deed giving Sims a life estate in the subject property was recorded. In October 1998, Robert Warren Thompson conveyed the subject property to Miles E. White and Ashley L. White, subject to the life estate of Sims.[3]
On January 7, 1999, Sims, individually and through her attorneys-in-fact,[4] in consideration of $151,000, executed a timber deed, selling “all merchantable pine timber, twelve (12) inches DBH [diameter to breast high] and larger” located on “Township 1 South, Range 3 East, Section 3, East Half (E/Q of the Southeast Quarter (SE]4)” to Loper Timber & Land Company (“Loper Timber”). The timber deed stated, in part:
“Although the present conveyance shall be effective from the date hereof to transfer the title to the subject timber to [Loper Timber], [Loper Timber] shall *331 not cut or remove any timber conveyed hereby until the entry of a final, non-appealable order by a Court of competent jurisdiction to the effect that [Sims] is the owner of the timber which is the subject hereof and that the present Timber Deed represents a valid conveyance of the rights of [Sims] in and to said timber. The termination of the life estate of [Sims] in the subject timber subsequent to the date hereof, but prior to the date of which the subject timber is cut and removed by [Loper Timber] shall not affect the title of [Loper Timber] to the subject timber and [Loper Timber] shall be entitled to exercise all of its rights hereunder during the term of this Timber Deed, notwithstanding the termination of the life estate of [Sims] during the term hereof.”
On January 11, 1999, Sims filed the present action, seeking a judgment declaring that she had the right to cut and remove the timber as described in the timber deed.
On July 22, 1999, Sims died. On December 21, 1999, Dorothy Watts, Charles W. Sims, and J. Eugene Sims, as coexecu-tors of the Estate of Nancy A. Sims, deceased, moved for an order substituting them as plaintiffs. The motion stated that the action was pending as of the date of Sims’s death and that it was not extinguished by her death. The trial court granted the motion to substitute.
At common law, a life tenant had no right to the proceeds from the sale of timber. A life tenant’s right to cut timber, without committing waste, was limited to clearing land, repairing buildings or fences, or cutting firewood. First Natl Bank of Mobile v. Wefel, 252 Ala. 212, 40 So.2d 434 (1949). This was subject to an exception:
“The exception [applied] to estates which were cultivated by the settlor and this custom has continued after his death, to produce salable timber where the timber is cut periodically. The reason assigned is that protecting and cutting timber periodically and pursuing a system of reforestation is a mode of cultivation, and such product is not then a part of the inheritance but part of the so-called annual fruits of the land; and in such cases the same kind of cultivation may be carried on by the tenant for life that has been carried on by the settlor; and the timber so cultivated and cut periodically is looked upon as annual profits of the estate when reforestation is pursued and therefore goes to the tenant for life.”
252 Ala. at 216, 40 So.2d at 437.
In its judgment, the trial court stated:
“5. Because the court concludes that Nancy A. Sims, during her lifetime, engaged in tree farming that under the terms of her life estate, she was entitled to the annual fruits of the land and that she had the legal right to enter into the contract of sale with Loper Timber Company. The court hereby determines that Nancy A. Sims had the right to cut and remove all merchantable pine timber, 12 inches in diameter at breast high and larger.... ”
On appeal, the Whites do not challenge the trial court’s finding that Sims operated a “tree farm.” However, the Whites contend that the trial court erred when it determined that Sims could execute a valid contract for the sale of “all merchantable pine timber, twelve (12) inches DBH and larger” even though, they argue, the undisputed evidence presented at trial showed that the manner of harvest contemplated by the terms of the contract was different in kind from the previous methods of harvest Sims had used.
*332 The plaintiffs argue that the cutting of timber contemplated by the timber deed is not different in kind from prior operations because, they say, the evidence presented at trial showed that their father and mother, and their mother after their father’s death, had set upon a management program designed to produce a steady stream of income from the sale of timber.
Mark Loper of Loper Timber testified that Sims managed the property as a tree farm and that although she did not have a written management plan, she managed the property by “taking out the defective trees or the bad trees first” and then just “thinned it” after that. Loper testified that thinning the timber is necessary to get natural regeneration of the longleaf pine and that one of Sims’s objectives was to avoid having to plant any trees.
First National Bank of Mobile v. Wefel, supra, holds that if the property has been operated as a “tree farm,” then all of the trees on the property constitute the “annual fruits of the land” and are owned by the life tenant or income beneficiary, to do with as he or she pleases.[5] As previously noted, the Whites do not challenge the trial court’s finding that Sims operated a “tree farm.” Without question, all of the trees on the subject property were produced as a result of Sims’s management of her tree farm.
When a landowner manages his property as a tree farm, the trees are just as much a crop as cotton would be, with one difference. A crop such as cotton must be removed from the land each year or else it will be lost. With timber, a landowner can decide how much timber he wishes to cut each year and is free to make decisions about whether to cut the timber or to leave it to grow, after considering many factors, e.g., market conditions, weather (such as storm damage), personal financial need, and what product the landowner wishes to sell — pulpwood, sawtimber, or poles. We do not read Wefel to limit these options by requiring that trees not cut in one cycle cannot be cut later in another.
It should be emphasized that the timber deed does not purport to allow Loper Timber to “clear-cut” the subject property. Timber will remain on the property. Robert L. Morris, a forester who was asked to “cruise” the timber on the Sims property, testified that under the terms of the timber deed approximately 42% of the timber on the subject property will be cut and 58% will remain. Loper testified that he estimates that approximately 70% of the timber will be cut and approximately 30% of the timber will be left.
Considering these facts, we conclude that the trial court correctly held that Nancy A. Sims had the legal right to enter into the timber sale with Loper Timber because, as a life tenant, she was entitled to the “annual fruits of the land,” which included the timber made the subject of the sale. Thus, the judgment of the trial court is affirmed.
AFFIRMED.
MOORE, C.J., and LYONS, JOHNSTONE, and WOODALL, JJ., concur.

. This was not always an unwritten understanding. In October 1988, Sims deeded the "Southeast Quarter (SE'/b of the Northwest Quarter (NW'/i) of Section 2, Township 1 South, Range 3 East" to her daughter, Dor-ice. In this October 1988 deed, Sims "reserve[d] unto herself, all timber situated on said property, together with the right to cut and receive income therefrom and together with reasonable rights of ingress and egress for harvesting said timber.” However, the deed to the property involved in this case does not contain such a reservation.

. The December 1972 deed described the property as follows: "East Half of Southeast Quarter, Section 3, Township 1 North, Range 3 East.” (Emphasis added.) In May 1974, a correction deed was executed wherein the property was described as follows: "East Half of Southeast Quarter, Section 3, Township 1 South, Range 3 East.” (Emphasis added.)

. The purchase price of the subject property was $144,000, payable on the date of purchase, in October 1998, and $56,000, payable within 60 days of the expiration of Sims's life estate in the property. The purchase agreement for the subject property provided as follows:
"1. Buyer shall be liable for the payment of the remaining $56,000 under this agreement only upon the life estate expiring with the timber remaining on the property, i.e., the holder of the life estate (including any agents [therefor]) unable to harvest timber. If holder of life estate should be entitled to harvest any timber, the $56,000 balance owing shall be reduced in an amount corresponding to the value of the timber so removed, calculated at the time said timber is harvested.
"2. Seller shall be responsible for the payment of all legal fees and costs associated with the defense or prosecution of any action to protect the interest conveyed from Seller to Buyer by virtue of the life estate held by Nancy A. Sims.”

.In August 1998, Sims had executed a durable general power of attorney, appointing three of her children, Charles Wilson Sims, James Eugene Sims, and Dorothy A. Watts, as her attorneys-in-fact.

. See Ala.Code 1975, § 19-3A-412 (that section, entitled "Timber,” appears as part of the codification of the Alabama Principal and Income Act). That section was not effective until January 1, 2001, and does not apply to this action. Effective January 1, 2001, Title 19, Chapter 3A (the Alabama Principal and Income Act) "applies whether or not a decedent or transferor was harvesting timber from the property before it became subject to the trust or decedent’s estate!’’ § 19-3A-412(c) (emphasis added).