BOLTAR, L.L.C., JOSEPH CALABRIA, JR., TAX MATTERS
PARTNER, PETITIONER *v*. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 25954–08.  Filed April 5, 2011.

In a conservation easement donation case, R moved to
exclude P's experts' report as unreliable and irrelevant under
Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993). *Held*: Standards of reliability and rel-
evance apply in trials without a jury, including Tax Court
trials, subject to the discretion of the trial Judge to receive
evidence. *Held*, *further*, P's experts failed to apply the correct

326

legal standard by failing to determine the value of the donated easement by the before and after valuation method, failed to value contiguous parcels owned by a partnership, and assumed development that was not feasible on the subject property. R's motion to exclude P's report and expert testimony is granted. *Held, further*, the value determination in the statutory notice is sustained.

*James R. Walker, Justin D. Cumming*, and *Christopher D. Freeman*, for petitioner.

*Steven I. Josephy* and *Miles B. Fuller*, for respondent.

COHEN, *Judge*: In a notice of final partnership administrative adjustment (FPAA) for 2003, respondent allowed only $42,400 out of $3,245,000 claimed as a charitable contribution deduction on the partnership return of Boltar, L.L.C. (Boltar). The deduction was claimed for the donation of a conservation easement on a portion of real property owned by Boltar and located in Lake County, Indiana.

Prior to trial, respondent filed a motion in limine to exclude petitioner's expert report and testimony as neither reliable nor relevant under the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The issues for decision are whether respondent's motion should be granted and, in any event, whether the value of the easement for charitable contribution purposes is greater than determined in the FPAA. Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, Boltar's principal place of business was in Colorado. Boltar is a Delaware limited liability company (LLC). Joseph Calabria, Jr., is Boltar's tax matters partner.

On December 31, 1996, Laura Lake Development Co., LLC (Laura Lake), acquired two contiguous parcels of real estate in Lake County, Indiana (the Northern Parcel and the Southern Parcel), each consisting of approximately 10 acres. Laura Lake paid approximately $10,000 per acre for the

Northern and Southern Parcels. On October 1, 1999, Laura Lake quitclaimed to Boltar the Northern and Southern Parcels. Boltar received the property from Laura Lake in payment of a note and to prevent foreclosure.

On November 8, 2002, Shirley Heinze Land Trust, Inc. (Shirley Heinze), quitclaimed to Boltar a parcel of real property located immediately east of the Southern Parcel and consisting of approximately 10.3 acres (the Eastern Parcel). The quitclaim deed was never recorded.

Beginning in 1955 and as of December 29, 2003, the Southern Parcel was encumbered by a 50-foot-wide pipeline utility easement. As of December 29, 2003, the Northern and Southern Parcels were both encumbered by an access (golf cart) easement in favor of the Gary Works Supervisors Club, Inc., and golf course.

On December 29, 2003, Boltar granted Shirley Heinze an easement restricting the use of approximately 8 acres (the subject easement) on the eastern side of the Southern Parcel (the Eased Area). The easement prevented any use of the property that would significantly impair or interfere with the conservation values of the property. Approximately 2.82 acres on the Eased Area, 8.5 acres on the eastern portion of the Northern Parcel, and all of the Eastern Parcel are forested wetlands falling within the jurisdiction of the U.S. Army Corps of Engineers (USACE).

The discharge of dredged or fill material in wetlands within Federal jurisdiction is subject to a permitting process through USACE. In Indiana, the State requires that a party obtain a permit separate from USACE's. A party must apply for a permit through the Indiana Department of Environmental Management (IDEM). The decisions to issue permits from both USACE and IDEM involve a review of the public interest factors and may vary depending on the location, amount, and type of wetlands a permit applicant is seeking to impact or remove. Generally, as a condition of obtaining a permit, a permit application must mitigate for impacted wetlands. Mitigation includes avoiding, minimizing, or compensating for lost resources. Compensatory mitigation can be accomplished through wetlands restoration, creation of new wetlands somewhere else within the neighboring area, or purchase of mitigation (development) credits from a wetlands mitigation bank. In 2003, the Lake Station Wetland Mitiga-

tion Bank serviced northern Indiana, including the subject parcels.

On December 29, 2003, the Northern and Southern Parcels were under the jurisdiction of Lake County, Indiana, and were zoned R–1, single-family residential, as described in the Lake County zoning ordinances. The R–1 zone residential use permitted by right was for one single-family home per acre if the property was serviced by a septic system and two per acre if serviced by a sewer system. As of December 29, 2003, Lake County did not provide water or sewer services independent of the services provided by municipalities.

On December 29, 2003, the Eastern Parcel was under the jurisdiction of the city of Hobart, Indiana, and was zoned as a Planned Unit Development (PUD) as part of the Deep River Pointe development. The proposed Deep River Pointe project included a total of three phases. Phases I and II would first be annexed into the city of Hobart and rezoned as a PUD, and Phase III would be annexed and zoned at a later date. No final plat was ever approved by the city of Hobart for Phase II of the Deep River Pointe PUD. The property comprising Phase III of the Deep River Pointe PUD was never annexed into the city of Hobart and never zoned as a PUD. The city of Hobart requires a public hearing as part of the annexation process.

On its 2003 Form 1065, U.S. Return of Partnership Income, Boltar claimed charitable contribution deductions of $3,259,000, of which $3,245,000 related to the donation of the subject easement. Boltar reported a fair market value of $3,270,000 for the subject easement as of December 31, 2003. The fair market value was reduced by $25,000 as a claimed enhancement in value to adjacent parcels owned by Boltar as a result of the donation of the subject easement.

Attached to Boltar's Form 1065 was a Form 8283, Noncash Charitable Contributions, signed by Gary K. DeClark, managing director and principal of Integra Realty Resources in Chicago, Illinois (Integra). Also attached to the return was an appraisal report (the Integra appraisal) prepared by DeClark and Nancy S. Myers (Myers), senior real estate analyst for Integra, on March 7, 2004. A member of Boltar's management team had met DeClark in 1998, and DeClark's firm had evaluated other conservation easements for Laura Lake and related projects. DeClark and Myers reviewed only

a draft of the easement before preparing their appraisal; they did not rely on the final version.

The Integra appraisal determined that the "highest and best use" of the subject property was residential development and determined the easement value as the difference between the "Foregone Development Opportunity of 174 Condominiums on Finished Sites, Discounted to December 31, 2003" (Scenario B)—$3,340,000 less the "Value of Raw, Vacant and Developable Land" (Scenario A)—$68,000. These values incorporated estimated wetlands mitigation costs of $28,000 ($10,000 per acre for the affected 2.8 acres) that DeClark and Myers calculated. The Integra appraisal asserted that the 174-unit condominium project, consisting of 29 buildings with 6 units each, was legally permissible, physically possible, financially feasible, and maximally productive on the Eased Area. The Integra appraisal relied in this regard on a site plan for a condominium project situated on approximately 10 acres. The Integra appraisal erroneously assumed that the Eased Area was under the jurisdiction of the city of Hobart and zoned as part of the Deep River Pointe PUD.

In the FPAA, the fair market value of the subject easement as of December 29, 2003, was determined to be $42,400, based on review by one of respondent's valuation engineers. The valuation engineer opined that the Integra appraisal failed to determine the value of the Eased Area before and after the grant of the easement. The valuation engineer concluded that the highest and best use of the subject property was for "development of single-family detached residential homes, but not until the surrounding properties are developed", partly because the Eased Parcel was landlocked with no direct access to a public road.

(No penalty was determined in the FPAA. Fifteen months after the answer was filed, 6 months after one continuance on respondent's motion, and 2½ months before the next scheduled trial date, respondent moved to amend the answer to assert a "pass-through penalty adjustment of $1,281,040". Respondent sought to assert a gross valuation misstatement penalty under section 6662(h) or, alternatively, the substantial valuation misstatement penalty under section 6662(e). Petitioner objected to the amendment, and the Court denied the motion as untimely and prejudicial.)

OPINION

*Valuation of Conservation Easement Donations*

Section 170(a)(1) provides that "There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."

Section 1.170A–1(c)(1), Income Tax Regs., provides in pertinent part: "If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution". Fair market value, as defined by the regulations, "is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A–1(c)(2), Income Tax Regs.

Section 1.170A–7(c), Income Tax Regs., provides that, except as provided in section 1.170A–14, Income Tax Regs., the amount of the deduction under section 170 in the case of a partial interest in property is the fair market value of the partial interest at the time of the contribution.

Section 1.170A–14(h)(3)(i), Income Tax Regs., states in relevant part:

The value of the contribution under section 170 in the case of a charitable contribution of a perpetual conservation restriction is the fair market value of the perpetual conservation restriction at the time of the contribution. See § 1.170A–7(c). If there is a substantial record of sales of easements comparable to the donated easement (such as purchases pursuant to a governmental program), the fair market value of the donated easement is based on the sales prices of such comparable easements. If no substantial record of market-place sales is available to use as a meaningful or valid comparison, as a general rule (but not necessarily in all cases) the fair market value of a perpetual conservation restriction is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction and the fair market value of the encumbered property after the granting of the restriction. * * *

See generally *Hilborn v. Commissioner*, 85 T.C. 677, 688–689 (1985).

The before and after methodology has been adopted and applied in various contexts. See, e.g., *Browning v. Commis-*

*sioner*, 109 T.C. 303, 311–316 (1997); *Symington v. Commissioner*, 87 T.C. 892, 894–895 (1986); *Stanley Works & Subs. v. Commissioner*, 87 T.C. 389 (1986); *Scheidelman v. Commissioner*, T.C. Memo. 2010–151; *Thayer v. Commissioner*, T.C. Memo. 1977–370; S. Rept. 96–1007, at 14–15 (1980), 1980–2 C.B. 599, 606; Rev. Rul. 76–376, 1976–2 C.B. 53; Rev. Rul. 73–339, 1973–2 C.B. 68. Although there may be cases in which the before and after methodology is neither feasible nor appropriate, petitioner has not provided any persuasive reason for not applying it in this case. Only petitioner's experts purport to provide a rationale for their peculiar methodology, which we reject for the reasons discussed below.

*Expert Reports*

In accordance with the Court's standing pretrial order and Rule 143(g), the parties exchanged and submitted expert reports. Petitioner's expert report consisted of the Integra appraisal and a transmittal letter to petitioner dated March 7, 2004, and a letter to petitioner's counsel dated April 15, 2010. In the letter dated April 15, 2010, DeClark and Myers addressed the views of the Internal Revenue Service valuation engineer but did not make any adjustments in their value opinion, maintaining that the amount determined in their 2004 appraisal was "supportable and appropriate." Responding to the suggestion that they failed to determine the before and after easement values, they asserted:

While it is obvious that the impressment of the easement severely impacts the realizable highest and best use of the eight-acre parcel, this impact is part and parcel of the deduction of the "as if raw" (Scenario A) value estimate from the estimate of the "foregone development opportunity" (Scenario B). Meanwhile, neither Scenario A nor Scenario B is described as an "as encumbered" (with the conservation easement) value estimate because that estimate is the result of the deduction process (A from B), rather than a freestanding value available to be measured in the marketplace with comparable sales. So, essentially, neither of the two scenarios represents encumbered land and, unencumbered, the appropriate highest and best use in both the "before" and "after" is, in fact, residential development. * * *

Respondent submitted the expert reports of Nick Tillema and Steven Albert. Tillema testified at trial. Respondent's experts opined that the value of the subject easement was

$31,280, the difference between a before-easement value of $100,600 and an after-easement value of $69,320. Respondent's experts determined that the highest and best use of the Eased Area was single-family residential before and after the easement, and they reached their results primarily on the basis of comparable sales. They determined that the unencumbered value of the Eased Area was $6,000 per acre and that the encumbered value was $2,000 per acre, which they applied to acreage including the contiguous parcels owned by Boltar.

*Respondent's Motion in Limine*

Prior to trial, respondent filed a motion in limine, asserting that the Integra report was neither reliable nor relevant because:

(1) The Integra Report does not provide both a before and after value of the subject property despite the assertion that Mr. DeClark and Ms. Meyers [sic] completed a before and after valuation;

(2) The Integra Report does not value all of the contiguous parcels owned by petitioner and encumbered by the conservation easement at issue in this case as required by the applicable Treasury Regulation; and

(3) The 174 condominium unit development evaluated as part of "Scenario B" in the Integra Report was not a physically possible use on the eight acre subject property analyzed in the Integra Report.

At trial, the Court deferred ruling on respondent's motion in limine because of the importance of the issues raised and the substantial effect on the case of eliminating petitioner's primary evidence. The Integra report was marked and the related testimony of petitioner's experts was heard solely as an offer of proof. Whether the report and testimony will be received in evidence and considered in determining fair market value of the easement depends on application of principles expressed in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. at 591, as related to rules 702 and 703 of the Federal Rules of Evidence.

In the reply brief, respondent aptly summarizes the deficiencies of the Integra experts' analysis as:

failure: to properly apply the before and after methodology, to value all of petitioner's contiguous landholdings, to take into consideration zoning restraints and density limitations and to take into consideration the pre-existing conservation easements. As a result, the Integra Experts saw nothing wrong with a hypothetical development project that could not fit

on the land they purportedly valued, was not economically feasible to construct and would not be legally permissible to be built in the foreseeable future.

Respondent asserts that petitioner has departed from the legal standard to be applied in determining the highest and best use of property and instead determined a value "based on whatever use generates the largest profit, apparently without regard to whether such use is needed or likely to be needed in the reasonably foreseeable future."

Petitioner argues that a *Daubert* analysis is not applicable in this case because there is no jury; that respondent previously accepted the methodology used in the Integra expert report and stipulated that the version attached to the partnership return was a qualified appraisal; that Rule 143(g) mandates receipt of the report in evidence; and that the matters complained of by respondent do not affect admissibility of the report.

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in *Daubert* stressed the trial court's "gatekeeper" function in excluding evidence that is not reliable. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999), the Supreme Court applied the same standard to expert testimony that was not "scientific". Although special considerations apply to jury trials, the *Daubert* analysis is not limited to jury trials. See *Atty. Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 779 (10th Cir. 2009); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (standards of relevance and reliability must be met in bench trials). In any event, rule 702 of the Federal Rules of Evidence applies to bench trials as well as to jury trials and specifically sets forth applicable standards of reliability.

We have long recognized that receipt of unreliable evidence is an imposition on the opposing party and on the trial process. See *Laureys v. Commissioner*, 92 T.C. 101, 127

(1989). We have also frequently stated that an expert loses usefulness to the Court and loses credibility when giving testimony tainted by overzealous advocacy. *Id.* at 129 (citing *Buffalo Tool & Die Manufacturing Co. v. Commissioner*, 74 T.C. 441, 452 (1980), and *Messing v. Commissioner*, 48 T.C. 502, 512 (1967)); see *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43, 86–87 (2000), affd. 299 F.3d 221 (3d Cir. 2002); *Wagner Constr., Inc. v. Commissioner*, T.C. Memo. 2001–160; *Jacobson v. Commissioner*, T.C. Memo. 1989–606. Expert opinions that disregard relevant facts affecting valuation or exaggerate value to incredible levels are rejected. See *Estate of Newhouse v. Commissioner*, 94 T.C. 193, 244 (1990); *Estate of Hall v. Commissioner*, 92 T.C. 312, 338 (1989); *Chiu v. Commissioner*, 84 T.C. 722, 734–735 (1985); *Estate of O'Keeffe v. Commissioner*, T.C. Memo. 1992–210; *Garrison v. Commissioner*, T.C. Memo. 1986–261 (concluding that the taxpayers were "far too aggressive in their claimed value of * * * [the donated] property and in seeking to profit from their 'good works' at the expense of Uncle Sam"); *Estate of Gallo v. Commissioner*, T.C. Memo. 1985–363.

In most cases, as in this one, there is no dispute about the qualifications of the appraisers. The problem is created by their willingness to use their résumés and their skills to advocate the position of the party who employs them without regard to objective and relevant facts, contrary to their professional obligations. See *Estate of Halas v. Commissioner*, 94 T.C. 570, 577–578 (1990).

As the above cases illustrate, the same rules apply regardless of which party offers the unreliable evidence. Justice is frequently portrayed as blindfolded to symbolize impartiality, but we need not blindly admit absurd expert opinions. For these reasons, excluding unreliable and irrelevant evidence, rather than receiving it "for what it is worth" and then rejecting it or giving it no weight, serves several purposes.

The Court's gatekeeper function in a bench trial serves to increase the efficiency of trials and the objectivity of judgments. After decades of warnings regarding the standards to be applied, we may fairly reject the burden on the parties and on the Court created by unreasonable, unreliable, and irrelevant expert testimony. In addition, the cottage industry of experts who function primarily in the market for tax benefits should be discouraged. Each case, of course, will involve

exercise of the discretion of the trial Judge to admit or exclude evidence. In this case, in the view of the trial Judge, the expert report is so far beyond the realm of usefulness that admission is inappropriate and exclusion serves salutary purposes.

In the context of this case, the task of the appraisers was to determine the fair market value of the 8-acre parcel and the contiguous parcels owned by Boltar before and after the easement was granted. Fair market value is consistently defined as the price that a willing buyer would pay a willing seller, both persons having reasonable knowledge of all relevant facts and neither person being under any compulsion to buy or to sell. *United States v. Cartwright*, 411 U.S. 546, 551 (1973); sec. 1.170A–1(c)(2), Income Tax Regs. The concept of "highest and best use" is an element in the determination of fair market value, but it does not eliminate the requirement that a hypothetical willing buyer would purchase the subject property for the indicated value. As we said in *Stanley Works & Subs. v. Commissioner*, 87 T.C. at 402 (citing *United States v. 320.0 Acres of Land*, 605 F.2d 762, 781 (5th Cir. 1979)): "If a hypothetical buyer would not reasonably have taken into account * * * [a] potential use in agreeing to purchase the property, such potential use should not be considered in valuing the property."

Petitioner quotes this Court's cases *Symington v. Commissioner*, 87 T.C. 892 (1986), *Stanley Works & Subs. v. Commissioner*, *supra*, and *Hughes v. Commissioner*, T.C. Memo. 2009–94, to emphasize the necessity of considering highest and best use by determining "realistic" or "objective potential uses", to which the subject property is "adaptable" and which are "reasonable and probable" uses. We conclude, however, that the Integra appraisal's valuations fail to apply realistic or objective assumptions.

In the Integra report, the experts opine that residential use of the property is the highest and best use. They value the property at $3,340,000 on the assumption that a 174-unit condominium project would be built on the property. Using that scenario, the report concludes that the conservation easement that would preclude the assumed development is to be valued at $3,270,000. As an alternative scenario, the report considers the value of the parcel as "raw land", concluding that to be $68,000. But the report does not determine

the highest and best use of the property after the easement is granted, as the Integra experts acknowledge in the April 2010 letter to petitioner's counsel submitted as part of their report for trial. The appraisers did not consider potential residential use of the property and thus did not value the property at its highest and best use after the easement was granted. From other evidence presented at trial, including the existing zoning, it appears that single-family residential use was feasible after the easement was granted and could have been developed with the preexisting easements. The Integra experts made no attempt to determine the highest and best use of the property after the easement was granted by considering the potential for single-family residential development.

In addition, as respondent argues, the Integra report does not consider the effect on contiguous property owned by Boltar. Petitioner argues that the effect on the contiguous property is considered in a separate exhibit, a three-page letter written to petitioner in 2004 by the authors of the report. Apparently the letter was the source of the $25,000 reduction in fair market value of the subject easement for which petitioner claimed a charitable contribution deduction on the return. It does not consider each of the contiguous parcels owned by Boltar, because the writers were unaware of the extent of Boltar's ownership. That letter, moreover, is not a part of the report submitted in accordance with Rule 143(g) and the Court's standing pretrial order. Consideration of the letter during trial would prejudice respondent in preparing rebuttal and would undermine the purpose of pretrial exchange of expert reports. In any event, it is not based on sufficient facts or data, as required by rule 702 of the Federal Rules of Evidence, and does not state the facts or data and detailed reasons for the conclusions, as required by Rule 143(g). Thus it would not be admissible as expert testimony or as an expert report if submitted as such before trial and before respondent's motion in limine was filed. Cf. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 952–954 (10th Cir. 2002) (holding that incomplete expert reports that do not comply with rule requiring pretrial disclosure should be stricken and can only be cured if sufficient time remains before trial).

In support of the argument that the 174-unit condominium project assumed by the Integra report could not be physically

placed on the subject property, respondent points out that the site plan for the proposal assumes 10 acres, whereas the subject property was only 8 acres, and the Integra experts ignored the effect of a preexisting 50-foot-wide utility easement for a gas pipeline across the property. As a result, respondent argues, at least 4 of the 29 hypothetical buildings, each containing 6 units, could not be constructed. Petitioner's only response is a bald and unpersuasive assertion that the project "will fit, it just won't fit as drawn" on the site plan.

The Integra report assumed erroneously that the Eased Parcel was within the city of Hobart and zoned PUD, which it was not. Thus the Integra report failed to evaluate the prospects for annexation and rezoning to allow development of the condominium project. Petitioner asserts that the likelihood of annexation and rezoning may be seen from the record, but the evidence supporting that assertion consists solely in the opinion of Boltar's management representative and is not persuasive in view of the prerequisites for annexation and rezoning. In any event, the omission of appropriate analysis from the Integra report, due to erroneous factual premises, is fatal.

Petitioner does not refute respondent's specific objections to the Integra report. Petitioner contends that the Integra report provides the only evidence of the "subdivision approach" that should be considered in valuing the subject property. Petitioner's response to respondent's objections to the Integra report and to the testimony of DeClark and Myers is to suggest that adjustments could be made because the effects of the factual errors are "minimal" and in part based on misinformation received from someone in the Hobart city office. We could do our own analysis and have done so where the experts provide enough useful and reliable data for applying the appropriate methodology to the objective evidence. See, e.g., *Trout Ranch, LLC v. Commissioner*, T.C. Memo. 2010–283. Petitioner's experts, however, did not suggest any adjustments or corrections to their calculations but persisted in their position that the original appraisal was correct, even when admitting factual errors. (By contrast, respondent's experts conducted research in areas that were not within their specific expertise, acknowledged weaknesses, and corrected errors during their analysis.) Neither peti-

tioner nor the Integra experts suggested any quantitative adjustment in response to their admitted errors or the problems addressed in respondent's motion in limine. They simply persist in asserting an unreasonable position. We are not inclined to guess at how their valuation should be reduced by reason of their erroneous factual assumptions. Their report as a whole is too speculative and unreliable to be useful.

In their discussion of the valuation issue, fully developed pending ruling on the motion in limine, the parties dispute other factors about the reasonableness of the Integra report's projections of profits to be earned from development of the property, including existing demand for residential units, miscalculation of revenue to be expected from sale of units, poor experience of other developers with respect to the Deep River Pointe project, density considerations, comparable sales, and other matters that might relate more to the weight to be given to the experts' opinions if admitted into evidence. Although the Integra experts determined that sales of comparable land nearby were occurring at approximately $12,000 an acre, their conclusion would assign a value of approximately $400,000 per acre to the subject property. Additional factual errors made by the Integra report authors undermine the reliability of their conclusions and demonstrate the lack of sanity in their result. If the report and their testimony were admitted into evidence, we would decide that their opinions were not credible. The assertion that the Eased Parcel had a fair market value exceeding $3.3 million on December 29, 2003, before donation of the easement, i.e., that it would attract a hypothetical purchaser and exchange hands at that price, defies reason and common sense. That conclusion is certainly inconsistent with the objective evidence in this case.

We reject petitioner's other arguments for admitting the Integra report. Neither the Commissioner's alleged acceptance of similar appraisals in other audit situations nor the procedural aspects of Rule 143(g) compel us to receive unreliable and irrelevant evidence in this case. What may or may not have occurred in another audit would be relevant only if a penalty were in issue, which it is not in this case because respondent's motion for leave to amend was untimely. An appraisal may be "qualified" for one purpose but lacking in

evidentiary weight for another. See *Evans v. Commissioner*, T.C. Memo. 2010–207. This issue is to be decided under the Federal Rules of Evidence and controlling caselaw. See Rule 143(a).

For the reasons stated above, we conclude that the Integra report is not admissible under rule 702 of the Federal Rules of Evidence, because it is not the product of reliable methods and the authors have not applied reliable principles and methods reliably to the facts of the case. Because it assumes scenarios that are unrealistic in view of the facts of the case, it is not relevant. Respondent's motion in limine will be granted. Respondent's rebuttal witnesses and petitioner's objections to respondent's rebuttal reports and testimony are thus moot and need not be addressed.

*Valuation of the Easement*

After the Integra report and testimony is excluded, the record contains factual evidence of value and the report and testimony of respondent's valuation expert. Petitioner has the burden of proving the value of the easement for charitable contribution deduction purposes. See Rule 142(a); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440–441 (1934). Because petitioner did not present credible evidence of value, the burden of proof did not shift to respondent under section 7491(a). Although respondent's experts determined a value less than that set forth in the statutory notice, respondent has not asked for an increased deficiency.

We are persuaded by the evidence in the record that the highest and best use of the Eased Parcel before and after the easement grant was single-family residential development. Even petitioner's rebuttal expert, who testified "with respect to real estate market analysis and feasibility in northwest Indiana", described demand for single-family residences and provided little, if any, support to the assumptions about condominium developments relied on by petitioner. There is no credible evidence that higher density development of the Eased Parcel was a use to which the property was adaptable, given the preexisting easements and existing zoning. The evidence regarding the experience of Boltar and others in the area and decreasing population negates the feasibility of and demand for the type of development asserted by petitioner.

There is no evidence that justifies a value higher than the amount determined in the statutory notice. It is not, therefore, necessary to address in detail petitioner's challenges to respondent's experts, because disregarding or adjusting their valuations would not change the result.

We have considered the other arguments of the parties. They do not affect our analysis or the result. For the reasons discussed above,

*An appropriate order will be issued, and decision will be entered for respondent.*