T.C. Memo. 2021-12

UNITED STATES TAX COURT

KEVIN A. SELLS, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  6267-12,  6801-12,        Filed January 28, 2021.
6835-12,  6836-12,
6837-12,  6838-12,
19246-12, 13553-13.

David Mace Wooldridge, Ronald A. Levitt, and Gregory P. Rhodes, for

petitioners.

Christopher A. Pavilonis, Laura A. Price, A. Gary Begun, and Denise A.

Diloreto, for respondent.

_____

[1] We consolidated seven cases for trial on the issues we analyze in this
opinion:  Lori Brown-James, docket number 6801-12; Jay and Sondra Pumroy,
docket number 6835-12; Charles G. and Mary D. Williams, docket number 6836-
12; Freddy H. and Penny J. Welch, docket number 6837-12; Stephen and Lucile
M. Whatley, docket number 6838-12; Steve and Janine Moses, docket number
19246-12; and John T. and Tammy I. Davis, docket number 13553-13.

**[\*2]**          MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Eight enterprising taxpayers created a partnership to buy property at a distress sale and then donate a conservation easement on it to a land trust.  They paid $1.4 million in August 2002 for the entire property, and valued the easement at $5.4 million in December 2003 when they donated it.

Why are these conservation-easement cases different from all other conservation-easement cases?  The Commissioner doesn't think they are.  He argues that the partners misstated the easement's value and that they should get no deductions at all because one of the clauses in the deed of easement violated the same regulation we construed and upheld in <u>Oakbrook Land Holdings, LLC v. Commissioner</u>, 154 T.C. 180 (2020), and <u>Oakbrook Land Holdings, LLC v. Commissioner</u>, T.C. Memo. 2020-54.  He is right that <u>Oakbrook</u> compels us to deny the entire conservation-easement deduction, but these cases still raise a few other issues, which include some especially knotty ones about penalties.

FINDINGS OF FACT

I.      <u>The Land and Easement</u>

Nestled in the foothills of the Appalachian Mountains near Anniston in Calhoun County, Alabama, lies a 398.01-acre piece of land.  It's close to Interstate

[*3] 20 and is comprised of 161.5 acres of flatland and 236.51 acres of mountainous land.[2]  Steven and Janine Moses bought it in November 1999 for about $2.4 million.  They planned to build a house and hippotherapy center[3] on the land.

But much of Moses' wealth was in technology stocks, and when the tech bubble burst in 2001, Mr. Moses suddenly became insolvent.  The Moseses decided to sell the land they had just bought.  They tried to sell the entire parcel, and when that didn't work they divided the flat part of their parcel from the part that was mountainous.  They were able to sell the 161.5 acres of flatland for about $1.4 million.  This left the Moseses with the mountainous land and a large pile of debt.  It seemed at first that they could find no buyer for the land that remained.

## II.    Burning Bush Farms, LLC

With Mr. Moses' debt still a problem, he and his attorney came up with a plan for him and seven of his friends.  In August 2002 Burning Bush Farms, LLC was formed with eight members--Kevin Sells, Charlie Williams, Steven Moses,

---

[2] The parties stipulated the total amount of land--398.01 acres.  There is a minor discrepancy throughout the record about how much mountainous land there was--the taxpayers claim it was 236.51 acres and the Commissioner claims it was 232.96 acres.  The stipulation supports the taxpayers on this minor point.

[3] Hippotherapy uses the care and riding of horses as therapy or rehabilitation for those who suffer from physical or mental disorders.

[*4] Freddy Welch, Jay Pumroy, John Davis, Lori Brown-James, and Stephen Whatley[4]--each a 12.5% owner. The Moseses then sold the mountainous land to Burning Bush for $1.4 million--the amount of Mr. Moses' existing debt--and they liken this to a distress sale.

Once Burning Bush took over, its members started to investigate how to put a conservation easement on their property. They spoke with Mark Pentecost of Chattoawah Open Land Trust, Inc. (COLT), whom Mr. Moses had worked with on conservation programs in the past. COLT provided Mr. Moses with "A Professional's Guide to Conservation Easements." In late 2003, Burning Bush deeded a conservation easement on the acres that it owned to COLT. It seemed that Burning Bush would be the way for the Moseses to cross from their debt troubles to the promised land with bags filled, not with jewels of gold and borrowed raiment, but with their more modern and valuable equivalent--very large tax deductions for themselves and their partners.

Might this work? The key is paragraph 16 of the deed, which contains an extinguishment-proceeds clause. It reads in full:

---

[4] Two others, George Silva and Phillip Ledbetter, were members of Burning Bush by the beginning of 2003 but seem to have dropped out by the end of the year. Their membership has no bearing on these cases.

[*5] Extinguishment. If circumstances arise in the future such as render the purpose of this Deed impossible to accomplish, this Conservation Easement can only be terminated or extinguished, whether in whole or in part, by judicial proceedings in a court of competent jurisdiction pursuant to Code of Alabama § 35-18-3(b). The amount of the proceeds to which Grantee shall be entitled, after the satisfaction of prior claims, from any sale, exchange, or involuntary conversion of all or any portion of the Property contemporaneously with, or subsequent to, such termination or extinguishment, shall be determined, unless otherwise provided by Alabama law at the time, in accordance with Paragraph 17 below. Grantee shall use all such proceeds in a manner consistent with the conservation purposes of this Deed.

OK so far. But then paragraph 17 adds:

Proceeds. This Conservation Easement constitutes a real property interest immediately vested in Grantee, which, for the purposes of this Paragraph 17, the parties stipulate to have a current fair market value determined by multiplying the fair market value of the Property unencumbered by the Conservation Easement (*minus any increase in value after the date of this Deed attributable to improvements*) by the ratio of the value of the Conservation Easement at the time of this Deed to the value of the Property, without deduction for the value of the Conservation Easement, at the time of this Deed, according to that certain Property Appraisal Report, dated November 1, 2003 and prepared by Tennille and Associates of Boone, North Carolina, for Burning Bush Farm, LLC. The values at the time of this Deed shall be those values used to calculate the deduction for federal income tax purposes allowable by reason of this Deed, pursuant to Section 170(h) of the Internal Revenue Code of 1954, as amended. For the purposes of this Paragraph, the ratio of the value of the Conservation Easement to the value of the Property unencumbered by the Conservation Easement shall remain constant. [Emphasis added.]

[*6] Burning Bush and its members relied on Katherine Ebbins, the executive director of COLT and a licensed attorney, to ensure that the conservation easement was properly put into place and complied with the regulations.

III.    Reporting

When the time came to file its return, Burning Bush did so on Form 1065, U.S. Return of Partnership Income.[5] Attached to its Form 1065 was Form 8283, Noncash Charitable Contributions. On page 2 of this form Burning Bush reported the donation of the conservation easement to COLT as a noncash charitable contribution with a value of just under $5.4 million. This amount was based on an appraisal of the property by David Roberts and Pattie Tennille--both senior residential appraisers. The Commissioner agrees that this was a "qualified appraisal," and that Burning Bush attached the appraisal to its partnership return as it needed to do. See sec. 1.170A-13(c)(2)(i), Income Tax Regs.[6]

Burning Bush also reported on this return a second noncash charitable contribution of "Timber" valued at $275,340. Burning Bush described the timber

---

[5] Partnerships don't pay taxes, but file Forms 1065 as informational returns. A partnership's income and deductions "flow through" to its partners. Sec. 701; 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49, at *44.

[6] All section references are to the Internal Revenue Code and regulations in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

[*7] as "PULP, Chip N SAW, SAW Timber." It attached a separate appraisal of this donated timber. That appraisal describes the timber as "forest products growing on [the] property." The appraisal then lists the value of eight types of "products."

Burning Bush issued Schedules K-1, Partner's Share of Income, Credits, Deductions, etc., to its eight members. Since the members were equal partners, each had a noncash, flowthrough charitable contribution of $708,792--the math works out to $674,375 for the donation of the conservation easement to COLT and $34,417 for the donation of the timber.

These amounts were very large compared to each partner's adjusted gross income, which meant that each of them had to carry forward some of that deduction to later years. See sec. 170(b)(1).

IV.   Audit and Trial

   A.   Audit

The Commissioner noticed these large deductions, arrayed several chariots of revenue agents against them, and shot forth against them a quiverful of notices of deficiency--sending each member his or her own. Each notice denied any

**[\*8]** deduction for the donation of either the conservation easement or the timber.[7]

All but one of the notices denied each member's deductions for failure to satisfy

the requirements for qualified conservation contributions.[8]

The Commissioner also wants penalties--for both the conservation easement

*and* the timber donation--but here the facts become a bit convoluted. The parties

stipulated that the Commissioner had a "penalty-approval form" only for the

Moseses and the Pumroys. Both these penalty-approval forms were approved by a

"Group Manager" and dated before the Moseses or the Pumroys received their

notices. The penalty-approval form for the Moseses shows approval of penalties

for substantial understatement and gross misvaluation, but doesn't approve a

penalty for negligence or substantial misvaluation. This form doesn't specifically

mention either the easement or the timber, but states that the "contribution

deduction appear[s] overstated by the valuation."

The revenue agent who drafted the penalty-approval form for the Pumroys

clearly wanted penalties for negligence and substantial understatement, but also

---

[7] In addition to the noncash contributions, the notices of deficiency also identified issues peculiar to specific members that aren't addressed in this opinion.

[8] The note of deficiency for the Moseses was a bit different--it generally denied the deductions for failure to qualify under section 170 without specifying failure to be qualified conservation contributions.

[*9] checked a box on a row that says this: "Section 6662(h) Substantial Valuation Misstatement." One can immediately see a problem--section 6662(h) defines *gross* misvaluation; it's section 6662(b)(3) that defines *substantial* misvaluation. The revenue agent filled in the comment box:

> The substantial adjustment is a flow through adjustment from the related partnership, Burning Bush Farm LLC Partnership. The adjustment is due to an overstated donation of a charitable contribution (Easement) and the Substantial Misstatement Penalty is applicable. The alternative position is that the negligence and substantial understatement penalty is applicable.

Because the verbal description says "substantial valuation misstatement" and the comment box mentions only "substantial misstatement penalty," we might have been inclined to find that the revenue agent was seeking approval for a substantial-misvaluation penalty. The Commissioner, however, asserted in his reply brief that "[t]he penalty approval form for Jay and Sondra Pumroy contains a scrivener's error that identifies the I.R.C. § 6662(h) gross valuation misstatement penalty as the substantial valuation misstatement penalty. Although the written reference is slightly ambiguous, the reference to I.R.C. § 6662(h) is clear." We accept his clarification of this ambiguity, and find that for the Pumroys the gross-misvaluation, and not the substantial-misvaluation, penalty was put in play and approved by this form.

[*10] One then turns to the notices of deficiency. Here there was a bit more uniformity. The Commissioner asserted 20% accuracy-related penalties under section 6662(a) for negligence, substantial understatement, or substantial misvaluation in the notices of deficiency against all the members except for Sells. None of the notices asserted a gross-misvaluation penalty under section 6662(h), even against the Moseses and Pumroys despite penalty-approval forms that approved section 6662(h) penalties against them.[9] (For them, this means that there was an initial determination of the penalty and approval by an immediate supervisor, though no communication of this to them.)

All eight members of Burning Bush filed their petitions while residents of Alabama.[10] The Commissioner amended his answers before trial to assert a gross-misvaluation penalty under section 6662(h) against each of the Burning Bush members except Sells.[11] All these amended answers were signed by Christopher Pavilonis who is the lead attorney in these cases; and before they were filed they

---

[9] A penalty computation worksheet attached to the Moseses' notice of deficiency says a portion of their understatement was attributable to gross misvaluation, but then determines that the portion was zero.

[10] We believe that this means any appeals will go to the Eleventh Circuit. See sec. 7482(b)(1)(A).

[11] The Commissioner seeks section 6662(h) penalties only for the conservation-easement donations, not for the timber donations.

**[*11]** were initialed by "agb", which refers to A. Gary Begun, who was Pavilonis's immediate supervisor.[12]

B.    Trial

We tried these cases in Birmingham, Alabama.  At trial the taxpayers orally moved to shift the burden of proof, on the ground that they had cooperated with the Commissioner's requests.  We granted their motion after trial, but it makes no difference because we can decide the various issues in these cases on a preponderance of evidence.

The parties settled many issues; one they did not is the subject of a separate opinion that we also release today.  See Whatley v. Commissioner, T.C. Memo. 2021-11.  We are left to decide in this opinion:

- whether the partners are entitled to deductions for Burning Bush's donation of the conservation easement to COLT,

- whether the partners are entitled to deductions for Burning Bush's donation of the timber, and

- whether any penalties apply.

---

[12] Begun also initialed all the Commissioner's motions to amend his answers except for one--the Moseses'.  In that case, however, his initials are on the proposed amendment that the Commissioner attached to his motion to amend.

**[*12]** OPINION

I. Noncash Charitable Contributions

A. Background

Section 170 sets the rules for the deductibility of charitable contributions, and there are regulations that go into much greater detail. See sec. 1.170A-13, Income Tax Regs. Those regulations distinguish between cash and noncash contributions, see, e.g., id. paras. (a) and (b), and contributions of different amounts, see, e.g., id. para. (b)(3).

One type of noncash charitable contribution is the donation of a partial interest in real estate. The Code generally disallows a charitable-contribution deduction for a gift of real property that "consists of less than the taxpayer's entire interest in such property." Sec. 170(f)(3)(A).

There is an exception for the donation of conservation easements. Sec. 170(f)(3)(B)(iii). A "qualified conservation contribution" is "a contribution-- (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." Sec. 170(h)(1). A contribution must satisfy each of these requirements, but our focus here is on the third requirement-- that the contribution be "exclusively for conservation purposes," sec. 170(h)(1)(C), which the Code defines in the negative: "A contribution shall not be

**[\*13]** treated as exclusively for conservation purposes unless the conservation purpose is *protected in perpetuity*," sec. 170(h)(5)(A) (emphasis added).

### B.    The Donation of the Conservation Easement

We will focus first on the donation of the conservation easement, which we must deny now that the Court has decided Oakbrook.[13]  In Oakbrook, we analyzed section 1.170A-14(g)(6), Income Tax Regs.  See Oakbrook, T.C. Memo. at \*20-\*28.  As we discussed there, a conservation easement must be protected in perpetuity.  See sec. 170(h)(5)(A); Oakbrook, T.C. Memo. at \*10.  Part of this protection must be the allocation of proceeds to the donee if the easement is condemned or otherwise extinguished.  Section 1.170A-14(g)(6)(i) tells us that the proceeds that do go to the donee must be used in a "manner consistent with the conservation purposes of the original contribution."  Oakbrook, T.C. Memo. at \*19.  Section 1.170A-14(g)(6)(ii) tells us that the amount that gets to the donee must be

> a *fair market value that is at least equal to the proportionate value* that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at the time \* \* \* [and that] on a subsequent sale \* \* \* [the donee] *must be entitled to a portion of the*

---

[13] Because Oakbrook was pending, we gave the parties the opportunity to make any arguments on this issue that they wished to preserve for appeal.  Both filed supplemental briefs to do so.

[*14] *proceeds at least equal to that proportionate value of the perpetual conservation restriction * * * .* [Emphasis added.]

"Proportionate value" demands the creation of a fraction, the numerator of which is the fair market value (FMV) of the easement and the denominator of which is the FMV of the contributed property unburdened by the easement, both on the date of donation. See Oakbrook, T.C. Memo. at *20. We followed the Fifth Circuit's lead in holding that this section of the regulations requires that the donee be entitled to receive this fraction multiplied by the *gross* proceeds of any extinguishment. See id. at *37-*38 (citing PBBM Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 207-08 (5th Cir. 2018)). This makes the donee entitled to a share of proceeds attributable to fluctuations in the property's value or to the value of post-donation improvements. See id. at *38. And in Oakbrook v. Commissioner, 154 T.C. 180, we held that this regulation was valid. Oakbrook's division opinion binds us. See, e.g., Sec. State Bank v. Commissioner, 111 T.C. 210, 213-14 (1998), aff'd, 214 F.3d 1254 (10th Cir. 2000).

Burning Bush's deed would subtract the value of any improvements from any condemnation award before calculating what percentage of those proceeds would go to the donee. That means that this deed, like the one in Oakbrook, doesn't comply with section 1.170A-14(g)(6)(ii), Income Tax Regs. See

**[\*15]** <u>Oakbrook</u>, T.C. Memo. at \*40-\*41.  That's enough to deny the partners' charitable-contribution deductions in full.

The partners make two arguments that we didn't see in <u>Oakbrook</u>.  The first is procedural--that the Commissioner waived his right to attack the conservation-easement deductions with his proceeds-clause spear because he didn't make the argument until after trial.  The partners are correct that this was a new argument by the Commissioner after trial; but between trial and our entry of a final decision we can consider new *arguments*, even if we can't consider new *issues*.  The difference is that new *issues* require new or different factfinding, but new *arguments* don't.  <u>See, e.g.</u>, <u>Metrocorp, Inc. v. Commissioner</u>, 116 T.C. 211, 232 (2001) (Ruwe, J., dissenting); <u>Park Place, Inc. v. Commissioner</u>, 57 T.C. 767, 768-69 (1972); <u>Barnette v. Commissioner</u>, T.C. Memo. 1992-595, 64 T.C.M. (CCH) 998, 1002 (1992), <u>supplementing</u> T.C. Memo. 1992-371.  If "sufficient facts are present, but \* \* \* a further exposition on the applicable law by the parties is desirable, [we] can call for further briefing."  <u>Barnette</u>, 64 T.C.M (CCH) at 1002.

That's what we did here.  There are a great many conservation-easement cases before our Court, and we are trying to be as consistent as possible in how we analyze them.  Even without supplemental briefing, the question is a legal one and "a deficiency assessment may be sustained upon any legal ground supporting it,

**[*16]** even though the Commissioner did not rely thereon when the assessment was made." Blansett v. United States, 283 F.2d 474, 478 (8th Cir. 1960).

The partners' next argument is a substantive one--that there is language in section 1.170A-14(g)(6)(ii) that nullifies the "proportionate value" requirement. The language that they point to is at the end:

> Accordingly, when a change in conditions give rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) * * * the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, *unless state law provides that the donor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction*.

Sec. 1.170A-14(g)(6)(ii), Income Tax Regs. (emphasis added). The partners argue that under Alabama law the owner of a conservation easement isn't entitled to proceeds where the land is "taken for and devoted to [a] public purpose." Burma Hills Dev. Co. v. Marr, 229 So.2d 776, 782 (Ala. 1969). Since Alabama law prevents the easement holder from being entitled to any proceeds, the proportionate-value-with-no-allowance-for-improvements clause of the regulation doesn't apply.

The problem for Burning Bush and its members here is that the regulation speaks of the involuntary conversion of a "perpetual conservation restriction,"

**[\*17]** <u>see</u> 1.170A-14(g)(6)(ii), Income Tax Regs., and the caselaw from Alabama that the members cite arises from the more traditional easements appurtenant that homeowners in a subdivision often have with each other.  <u>See</u> <u>Oakbrook</u>, T.C. Memo. at \*14-\*16 (contrasting conservation easements with traditional easements appurtenant).  Caselaw does indeed align Alabama state law with the view that the condemnation of a property subject to an easement results in condemnation awards only to the property owner, not the easement owner.  <u>Burma Hills</u>, 229 So.2d at 779.

We do not, however, think that Alabama law on this subject is what the regulation means when it speaks of a state law that "provides that the donor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction."  Sec. 1.170A-14(g)(6)(ii), Income Tax Regs.  Here's why:  When, for example, property owners in a subdivision all have easements on each other's properties in the form of restrictions on use of their property to "residential purposes only," there is ambiguity about whether that easement is a contract right or a property right.  When a local government in Alabama condemns land to construct a road or build a school, it has to invoke eminent domain against "property owners" and compensate them.  If all the homeowners in a subdivision were "owners" of the condemned property, they too

[*18] would need to be pleaded in and receive compensation for whatever the value of their easement was.  If they weren't, the condemning government would succeed only to the condemned property owner's rights--instead of getting land on which to build a road, the local highway department would get only land which it could use "for residential purposes only."

This would be decidedly unsatisfactory, and Alabama rejected that characterization in Burma Hills.  229 So.2d at 781-82.  The Alabama Supreme Court held there that the holder of an easement in condemned property was not a "property owner," but the holder of an enforceable contract right against the property owner.  When conditions change, all the easement holders can be freed of their mutual obligation to each other, which is a benefit to each of them.  This is what we called in Oakbrook the "implicit compensation for the loss of a servitude" that lies in extinguishment of mutual easements.  See Oakbrook, T.C. Memo. at *15.  The Alabama Supreme Court expressed the same idea more eloquently:

> It is a familiar rule that, when the physical conditions in the vicinity of the land thus restricted have so changed as to render it unconscionable to enforce the restriction, equity will refuse to enforce, and the restriction as to its enforceability then fades out of the contract of the parties.

Burma Hills, 229 So.2d at 780.

**[*19]** As we explained in <u>Oakbrook</u>, T.C. Memo. at *16-*17, most states enacted statutes to change this part of common law as it might affect conservation easements. Alabama was among them, and section 35-18-1 of its Code now defines the interest of the donee of a conservation easement as the "nonpossessory interest of a holder in real property." We looked for, but admittedly didn't find, an Alabama case that distinguishes conservation easements from other easements in this way. But even without a case, the language of the statute gets us there--we hold that the easement that Burning Bush donated was not a contract right but an interest in property whose holder must be compensated for its condemnation or destruction or other conversion.

We also found at least one state law that *does* seem to be governed by the last few lines in section 1.170A-14(g)(6)(ii). California's Government Code states:

> If any land or a portion thereof as to which any city or county has accepted or approved an open-space easement pursuant to this chapter is thereafter sought to be condemned for public use and the easement was received as a gift without the payment of any compensation therefor, the easement shall terminate as of the time of the filing of the complaint in condemnation as to the land or portion thereof sought to be taken for public use, and *the owner shall be entitled to such compensation for the taking as he would have been entitled to had the land not been burdened by the easement*.

Cal. Gov't Code sec. 51095 (West 2003) (emphasis added).

**[\*20]** The reason for such an apparently odd provision is that the California legislature was worried that local governments would view property with conservation easements as especially juicy targets for condemnation because they could be had cheaply. See Nancy A. McLaughlin, "Internal Revenue Code Section 170(h): National Perpetuity Standards for Federally Subsidized Conservation Easements," 45 Real Prop., Tr. & Est. L.J. 473, 500 n.103 (2010).

We can safely reject Burning Bush's state-law argument. The general rule of section 1.170A-14(g)(6)(ii) applies and forces us to disallow the deduction for the conservation easement.[14]

That leaves us to figure out the partners' second noncash charitable contribution--their donation of timber on the property.

### C. The Donation of Timber

#### 1. What's at Issue?

The Commissioner challenged the deductibility of Burning Bush's donation of timber in his posttrial brief. The partners argued in their posttrial brief that this

---

[14] Our result, if not our more verbose explanation, is the same as in two other cases from Alabama that we recently decided. See Smith Lake, LLC v. Commissioner, T.C. Memo. 2020-107, at \*9; Hewitt v. Commissioner, T.C. Memo. 2020-89, at \*22-\*24.

[*21] is the first they're hearing of the issue, and they say this means that it's not properly before us.

As a general rule, we consider only the issues that the parties plead. See, e.g., Markwardt v. Commissioner, 64 T.C. 989, 997 (1975). Both the parties and the Court need fair notice of what's in controversy. See Rule 31(a). The Commissioner has three distinct opportunities in the life of a case to identify what he wants to put in play: the notice of deficiency, his answer, and any amended answer. Seligman v. Commissioner, 84 T.C. 191, 198 (1985), aff'd, 796 F.2d 116 (5th Cir. 1988). We're not sticklers, but we do require the Commissioner to put taxpayers on "fair notice." See Markwardt, 64 T.C. at 997.

Here we do find each partner was put on fair notice that the timber donation was at issue. The Commissioner denied each member's total noncash charitable deduction, and we think any reasonable taxpayer would recognize that disallowing the sum of two numbers means that both are disallowed. The members, in their petitions, challenged the disallowance of this total dollar amount even though they didn't mention the disallowance of the timber-donation portion with any specificity. We find from this they did indeed challenge its disallowance. And in his pretrial memo the Commissioner specifically stated that the contribution of timber was being challenged--albeit as a "Conservation Easement Issue[]." This is

[*22] enough for fair notice.  See Geiselman v. United States, 961 F.2d 1, 4-5 (1st Cir. 1992); Abatti v. Commissioner, 644 F.2d 1385, 1389 (9th Cir. 1981), rev'g T.C. Memo. 1978-392.

### 2.    Donation of the Timber

Although we find that the donation of Burning Bush's timber is at issue, we agree with the members that the Commissioner's analysis of it is quite confusing. He argues in his posttrial briefs that the timber donation violates section 170(h)-- the subsection that addresses contributions of qualified conservation easements. He specifically argues that the timber donation doesn't have a conservation purpose since the clearcutting of land can't possibly be for a conservation purpose.

As we search through the record, we find next to no other mention of the timber donation from either party.  The only evidence that we have (besides the disallowance of the timber donations in the notices of deficiency) is the initial claiming of the deduction by the partners on their tax returns.  Those returns each have two separate Forms 8283 attached--one for the donation of the conservation easement and one for the donation of "Timber".  And attached to each form were separate appraisals--one of the value of the conservation easement and one of the value of the timber.  The appraisal of the timber donation describes the value of eight timber products that were "growing on [the] property" but makes no mention

[*23] of a conservation easement.  When we look at the entire record, we find it more likely than not that the timber donation was not a donation of a conservation easement but rather just a separate noncash donation.  Section 170(h) and its regulations that govern the donation of conservation easements just don't apply.

But that doesn't mean the partners are out of the woods just yet.  According to the appraisal, Burning Bush acquired the land on which it placed the easement on the very same date that it reported it had acquired the timber--August 6, 2002.  And Burning Bush contributed both the easement and the timber to the same donee, COLT.  Because of this, we find it more likely than not that the timber donated by Burning Bush is the same standing timber on which it had placed a conservation easement.

That is a problem.  The value that Burning Bush placed on the standing timber is its value as timber products.  One can see this on the Form 8283--which describes the donation of "Pulp, Chip N Saw, Saw Timber"--products that result from timber's harvest.  And the attached appraisal--which described eight products--would require the timber's harvest.

[*24] The problem here is that Alabama law[15] makes timber that hasn't been severed from the land the property of the land owner, and as a general rule not even a life tenant has the right to cut and sell it. See White v. Watts, 812 So.2d 328, 331 (Ala. 2001); Wilder v. Scott, 89 So.2d 682, 685 (Ala. 1956). There are exceptions to this general rule--if the property was a tree farm, White, 812 So.2d at 331; Robinson v. Robinson, 215 So.2d 585, 590-91 (Ala. 1967), or the timber cutting was an incident to clearing land for cultivation, Westmoreland v. Birmingham Tr. & Sav. Bank, 108 So. 536, 538 (Ala. 1926)--but none of these could conceivably apply here.

The cutting of timber and its conversion into lumber and other wood products is not a conservation purpose. See sec. 170(h)(4)(A); sec. 1.170A-14(e), Income Tax Regs. The deed forbids it.[16] That makes Burning Bush's donation of the timber either a nondeductible gift of a partial interest in real estate other than a conservation easement, or a future interest in tangible personal property. If it's the first, the Code says it's never deductible, see sec. 170(f)(3)(A); if it's the second,

---

[15] State law defines property interests. See, e.g., Case v. United States, 633 F.2d 1240, 1246 (6th Cir. 1980); Oakbrook, T.C. Memo. at *34.

[16] That makes these cases different from Butler Land Holdings, LLC v. Commissioner, T.C. Memo. 2012-72, 2012 WL 913695, at *42-*43, because there the deed explicitly allowed the harvesting of timber as part of an approved plan.

[*25] section 170(a)(3) says that it's not deductible until the timber is severed from the real property. Either way, the members of Burning Bush don't get deductions for donating standing timber to COLT for their 2003 tax year.

II.     Penalties

That leaves penalties. Here again confusion reigns. The Commissioner wants penalties for both the conservation easement *and* the timber donation. And one would think the outcome for each partner should be the same--after all, at first glance they seem to be lined up in the same rank and one might have expected the Commissioner to unleash a light barrage that would easily hit them all. But the Commissioner misfired, causing chaos and confusion; and we are left to assess the damage.

We will first briefly discuss the penalties involved, and then whether the partners can shelter from them in the procedural defenses that we have recently made available. Only then do we decide any remaining penalty issues on their merits.

There are two genera of penalties here. One is commonly called the "accuracy related" or "section 6662(a)" penalty. The Code lists several species within this genus in section 6662(b), and three are involved here: section 6662(b)(1), which penalizes understatements due to negligence or intentional

[*26] disregard of rules and regulations; section 6662(b)(2), which penalizes "substantial understatement" of the tax due; and section 6662(b)(3), which penalizes "substantial" valuation misstatements. All of these carry a 20% penalty, and the Commissioner has to hit with only one of the three to win.

Then there is a 40% penalty.

Section 6662(h) imposes this megapenalty for "gross" misstatements of value on a return.[17] It might seem odd that unlike, for example, manslaughter and murder, a "substantial" misvaluation is not a lesser-included offense of "gross" misvaluation. In Oropeza v. Commissioner, 155 T.C. __ (slip op. at 18) (Oct. 13, 2020), we held precisely that section 6662(i) "does not impose a distinct penalty; it simply increases the rate imposed for the penalty determined under section 6662(a) and (b)(6)." We also held there that, without supervisory approval of a

---

[17] Congress revised some of the Code's penalty provisions in 2006. See Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 1219(a)(2)(A), 120 Stat. at 1083. Part of this revision was a change in the definition of how far off a reported value had to be from its true value to be penalized as a "gross" or "substantial" misstatement. Id. We apply the old definitions here because Burning Bush reported this donation on its 2003 information return, before the amendment's effective date. When a passthrough entity reports a contested value on its return, we decide whether that value was a "substantial" or "gross" misstatement at the entity level. Sec. 1.6662-5(h)(1), Income Tax Regs.; see Plateau Holdings, LLC v. Commissioner, T.C. Memo. 2020-93, at *30-*31.

[*27] penalty under section 6662(b)(6), approval of a penalty under section 6662(i) was procedurally inadequate. Id. at __ (slip op. at 20-21).

In another T.C. opinion, Palmolive Bldg. Inv'rs, LLC v. Commissioner, 152 T.C. 75, 79 n.3, 83-84 (2019), we concluded that the substantial- and gross-misvaluation penalties were distinct with each requiring supervisory approval. As we plainly reiterated in Campbell v. Commissioner, T.C. Memo. 2020-41, at *32, "the section 6662(a) and (h) penalties are distinct (despite the title of section 6662 referring to a (singular) penalty), and *the initial determination under each subsection must be separately approved* for purposes of section 6751(b)(1)." (Emphasis added.) See also Rogers v. Commissioner, T.C. Memo. 2019-61, at *20.

A.      The Chaighoul Problem

Classifying penalties by genus and species is not purely intellectual sport, because it is not enough for the Commissioner to assert penalties in a notice of deficiency or a pleading. He must also show that he complied with section 6751(b) as we have construed it for the last few years. That section states that no penalty is allowed unless the "initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination." Sec. 6751(b)(1). We have construed this to mean

[*28] that written approval was secured at least by the time the Commissioner issued the notice of deficiency or when he filed the answer or amended answer in which he asserted the penalty. Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42; see also Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016).

Approval of one species of penalty doesn't mean approval of any other. In Palmolive, we stated that though the title of section 6662 refers to a singular "penalty," that section in fact creates several distinct penalties. Palmolive, 152 T.C. at 87. One consequence is that the Commissioner must show approval of each penalty separately to show that he has complied with section 6751(b)(1). Id.; see also McCarthy v. Commissioner, T.C. Memo. 2020-74, at *28-*29; Campbell, T.C. Memo. at *32-*33.

We have also said that this approval doesn't have to take any particular form. See Palmolive, 152 T.C. at 86. But here the Commissioner relied on his aptly named "Civil Penalty Approval Form." Two of the section 6662(b) penalties--negligence and substantial understatement--have their own lines on this form. The form also has a line for the more generally described "other accuracy related penalties" under section 6662(b), which we will assume includes the

**[\*29]** "substantial" misvaluation penalty defined in section 6662(b)(3). There is also a separate line for a gross-misvaluation penalty under section 6662(h).

There's no problem with an IRS employee's ticking more than one box on this form. And in the specific instance of misvaluation penalties, we have held that there's nothing improper in the Commissioner's asserting a 20% substantial misvaluation penalty and *in the alternative* asserting a 40% gross-misvaluation penalty. See Legg v. Commissioner, 145 T.C. 344, 349-51 (2015).

What happened here?

The parties stipulated that the IRS revenue agent completed only two penalty-approval forms, one each for the Moseses and the Pumroys, before he sent out notices of deficiency to all the Burning Bush partners. The Moseses' penalty-approval form mentions only a substantial-understatement penalty and gross-misvaluation penalty. The revenue agent wrote: "The contribution deduction appears overstated by the valuation." The Pumroys were the most unlucky--on their penalty-approval form a supervisor approved both a negligence penalty and a substantial-understatement penalty, as well as a gross-misvaluation penalty. And the same revenue agent was a bit more detailed in the comments section for the Pumroys, writing: "The adjustment is due to an overstated donation of a charitable contribution (Easement) and the Substantial misstatement Penalty is

**[*30]** applicable. The alternative position is that the negligence and substantial

understatement penalty is applicable."

The Commissioner then sent out notices of deficiency to all the Burning

Bush partners in which the Commissioner asserted penalties under section

6662(b)(1), (b)(2), and (b)(3) for 7 of the 8 partners. It's easier to see in a table:

| Taxpayer | Penalties on penalty approval form | Penalties in notice of deficiency |
|---|---|---|
| Kevin Sells | No form | None |
| Charlie Williams | No form | 6662(b)(1), (2), & (3) |
| Steve Moses | Yes for 6662(b)(2) & (h) | Penalty asserted under 6662(b)(1), (2), & (3) only for tax years 2005 and 2007 |
| Butch Welch | No form | 6651(a)[18] and 6662(b)(1), (2), & (3) |
| Jay Pumroy | Yes, for sec. 6662(b)(1), (2), & (h) | 6662(b)(1), (2), & (3) |
| John Davis | No form | 6662(b)(1), (2), & (3) |

---

[18] The Welches contested the section 6651(a) penalty for years 2003 and 2004 in their petition. The Commissioner did not concede the issue. The Welches, however, failed to provide any explanation for why they thought these penalties are erroneous. They didn't testify and didn't mention these penalties in their posttrial brief. They therefore lose this issue. See Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 347-49 (1991); Hockaden & Assocs., Inc. v. Commissioner, 84 T.C. 13, 16 n.3 (1985), aff'd, 800 F.2d 70 (6th Cir. 1986).

| **[*31]** Lori James | No form | 6662(b)(1), (2), & (3) |
|---|---|---|
| Stephen Whatley | No form | 6662(b)(1), (2), & (3) |

All the Burning Bush partners other than the Moseses and the Pumroys thus emerge unscathed by any of the penalties asserted--for either the conservation easement or the timber donation--in their respective notices of deficiency. The Moseses and the Pumroys, however, require some explanation.

The Moseses need not worry about any penalties related to the timber donation. The approval form makes no mention of the timber and it states the proposed adjustment was due to the "valuation" of the contribution. And the timber's value was never challenged by the Commissioner. Therefore we find it more likely than not there was no written supervisory approval for a penalty related to the timber donation for the Moseses.

The Pumroys' situation is different. There was no supervisory approval for any substantial-misvaluation penalty--no section 6662(b)(3) penalty for the donation of either the conservation easement or the timber. But for the rest of the asserted penalties, the Pumroys once again might feel singled out. On the penalty-approval form for the Pumroys, and unlike the one for the Moseses, the revenue agent didn't limit his initial decision to assert penalties to valuation, but instead took issue with the deduction as a whole. Though he wrote that the adjustment is

[*32] for the "Easement", and we found that the attempted timber donation was not the donation of an easement, see supra pp. 22-25, the Commissioner consistently characterized the timber donation as an "easement" all the way from the notice of deficiency through trial. This leads us to find it more likely than not that there was written supervisory approval for both negligence and substantial-understatement penalties for the Pumroys' donations of both the conservation easement *and* the timber.

For all the other taxpayers and types of penalty and particular donation there was no supervisory approval in writing before the Commissioner formally communicated his penalty determinations to the partners. See Chai, 851 F.3d at 221; see also Graev, 149 T.C. at 493.

As these cases made their way toward trial, the Commissioner's lawyer noticed that his revenue agent had won approval to assert section 6662(h) gross-misvaluation penalties (at least for some of the partners), but no one at the IRS had actually notified any of the partners in the notices of deficiency of his determination to do so. The Commissioner then amended his answers in these cases to formally communicate for the first time that he sought section 6662(h) gross-misvaluation penalties against each Burning Bush member except Sells for

[*33] the donation of the conservation easement.[19]  Each amended answer was signed by both the lead attorney in these cases and his associate area counsel.  See Roth v. Commissioner, T.C. Memo. 2017-248, at *10-*11 (stating that an answer that asserts penalties, signed by both counsel and the area counsel, satisfies section 6751(b)).  Since the lead attorney's immediate supervisor gave his written approval, and this was the first time the Commissioner formally communicated to the taxpayers that he wanted penalties from them under section 6662(h), it might look as though he did satisfy section 6751(b) for the gross-misvaluation penalties for all Burning Bush members except Sells.

In Oropeza, however, we reasoned that supervisory approval of a penalty under section 6662(i) was necessary, but not sufficient without approval of a penalty under section 6662(b)(6)--that the 40% penalty was an *enhancement*, not a penalty entire unto itself.  Similar logic might well lead us to hold in the future that supervisory approval of a 40% gross-misvaluation penalty under section 6662(h) is likewise inadequate without approval of a substantial-misvaluation penalty under section 6662(b)(3).  There was none here.  But we'll reserve that question for a later case where the parties argue it.

---

[19] The amended answers assert gross-misvaluation penalties for the donation of the conservation easement valued at $5.4 million--which excludes any gross-misvaluation misstatement penalties for the timber donation.

[*34] If Graev were a goalie, it has put on a Hašek-level performance in these

cases.  The resulting shots on goal and saves are all easier to see in tabular form:

| Taxpayer | Penalty At Issue |
|---|---|
| Kevin Sells | ~~Section 6662(b)(1)~~<br>~~Section 6662(b)(2)~~<br>~~Section 6662(b)(3)~~<br>~~Section 6662(h)~~ |
| Charlie Williams | ~~Section 6662(b)(1)~~<br>~~Section 6662(b)(2)~~<br>~~Section 6662(b)(3)~~<br>Section 6662(h) |
| Steve Moses | ~~Section 6662(b)(1)~~<br>Section 6662(b)(2)[20]<br>~~Section 6662(b)(3)~~<br>Section 6662(h) |
| Butch Welch | ~~Section 6662(b)(1)~~<br>~~Section 6662(b)(2)~~<br>~~Section 6662(b)(3)~~<br>Section 6662(h) |
| Jay Pumroy | Section 6662(b)(1)<br>Section 6662(b)(2)<br>~~Section 6662(b)(3)~~<br>Section 6662(h) |
| John Davis | ~~Section 6662(b)(1)~~<br>~~Section 6662(b)(2)~~<br>~~Section 6662(b)(3)~~<br>Section 6662(h) |

---

[20] This does not apply to the timber donation.  See supra pp. 22-25.

| [*35] | Lori James | ~~Section 6662(b)(1)~~ ~~Section 6662(b)(2)~~ ~~Section 6662(b)(3)~~ Section 6662(h) |
|---|---|---|
| | Stephen Whatley | ~~Section 6662(b)(1)~~ ~~Section 6662(b)(2)~~ ~~Section 6662(b)(3)~~ Section 6662(h) |

### B. Section 6662(b)(1) and (2) Penalties

That leaves us to decide only the merits of the penalty determinations that managed to trickle through section 6751's procedural protection. The only accuracy-related penalties that got through were: a section 6662(b)(2) penalty for the conservation easement donation deducted by the Moseses, and both section 6662(b)(1) and (2) penalties for both the conservation easement *and* timber donations deducted by the Pumroys.

#### 1. Burden of Production

The Commissioner has the burden of production with respect to penalties. Sec. 7491(c). To meet his burden the Commissioner must produce evidence regarding the appropriateness of imposing a penalty. Higbee v. Commissioner, 116 T.C. 438, 446 (2001). For penalties related to the donation of the conservation easement, this burden is unquestionably met by evidence of its proper value.

**[\*36]** For both penalties related to the Burning Bush's timber donation, the Commissioner also satisfied the burden of production as to the Pumroys. He first asserts the Pumroys were negligent and disregarded the rules or regulations with this deduction. See sec. 6662(c). Taking a donation based on the value of timber products--which would require the chopping down of the timber--on land that just had a conservation easement placed on it seems on its face "too good to be true." Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. The Commissioner meets his burden of production for a section 6662(b)(1) penalty. As for a potential substantial-understatement penalty under section 6662(b)(2), the question is whether the math shows that disallowance of the timber donation would lead to a substantial understatement by the Pumroys. We'll leave that for the computation stage. See Mileham v. Commissioner, T.C. Memo. 2017-168, at \*46-\*47.

        2.     Section 6664(c)

What these penalties have in common is the availability of a reasonable-cause-and-good-faith defense. Sec. 6664(c); sec. 1.6664-4(a), Income Tax Regs. The determination of whether a taxpayer acted with reasonable cause and in good faith is one we make on a case-by-case basis. Sec. 1.6664-4(b)(1), Income Tax Regs. One circumstance that indicates reasonable cause and good faith is an honest misunderstanding of fact or law that is reasonable in light of all of the facts

**[*37]** and circumstances.  Id.  Reliance on certain facts can constitute good faith if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith."  Id.

We denied the deductions for the donation of the conservation easement here because the proceeds clause in the deed violated the regulation.  But we think Burning Bush's position was reasonable:  An IRS private letter ruling (PLR) suggested that a clause like the one in the deed here would satisfy the regulation. See Priv. Ltr. Rul. 200836014 (Sept. 5, 2008) (stating that decreasing the donee's proceeds by the grantor's permissible improvements does not violate the regulation).  A PLR from 2008 is not, of course, something that any of the Burning Bush partners could have subjectively relied on in preparing their returns for much earlier tax years, but we do find that it provides an objective indication of the

[*38] reasonableness of the position they took.[21]  See secs. 1.6662-3(b)(3),

1.6662-4(d)(3)(iii), Income Tax Regs.  We found in Oakbrook that the use of this

commonplace language in the deed, though ultimately fatal to the deduction, was

sufficient to show reasonable cause for their error.  See Oakbrook, T.C. Memo.

at *43.

And both Pumroy and Moses, like all the Burning Bush partners, looked to

Ebbins, the executive director of COLT, to ensure that their conservation easement

complied with the regulations.  The language used in the deed was widespread

throughout the Southeast.  See id. at *7 n.2.  We therefore find that their error was

reasonable under these circumstances--not just because of the PLR, but because

COLT had a good deal of experience in this complicated nook of tax law and was

not a promoter or otherwise tainted in providing advice in how to get the donation

---

[21] The Eighth Circuit recently held in Wells Fargo & Co. v. United States, 957 F.3d 840, 852 (8th Cir. 2020), that a taxpayer must show it actually relied on a PLR to establish it had a reasonable *basis* for its position.  We don't need to find that the reasonable *basis* standard--a relatively high standard for tax reporting, see sec. 1.6662-3(b)(3), Income Tax Regs.--was met.  We must decide instead whether Burning Bush's members here had reasonable *cause* for their error.  This is a lower threshold for a taxpayer to pass over.  See id. ("[T]he reasonable cause and good faith exception * * * may provide relief from the penalty of negligence * * * *even if a return position does not satisfy the reasonable basis standard*." (Emphasis added.)).  A PLR is of some help to a taxpayer trying to show that his position was reasonable, though it remains only one factor in the all-facts-and-circumstances test we apply.  See sec. 1.6664-4(b), Income Tax Regs.

[*39] done properly.  Based on their credible testimony, we also find that both Moses and Pumroy took this position entirely in good faith.  We therefore find the Moseses do not owe penalties under section 6662(b)(2).  We also find the Pumroys aren't liable for the section 6662(b)(1) or (2) penalty for the donation of the conservation easement.

But does this defense also work for the Pumroys' timber donation?  We think not.  Whether the Pumroys had reasonable cause and good faith is a decision made on a case-by-case basis after consideration of all pertinent facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  We must take into account the Pumroys' experience and education when determining whether there was reasonable cause or good faith for their position.  See id.  Pumroy is an attorney whose practice focuses on real estate.  He is a well educated person who has an above-average knowledge of real estate.  We therefore find it more likely than not that claiming a deduction for the timber donation was unreasonable.  Pumroy should have been aware that if Burning Bush donated a conservation easement then it couldn't simultaneously donate timber whose value was based on chopping trees down in violation of the conservation deed.  On its face pairing these deductions was unreasonable and too good to be true.  Pumroy never testified that he received advice related to this timber donation, and even if he had,

**[\*40]** we would still find this position unreasonable. We therefore find that the reasonable-cause-and-good-faith defense doesn't protect the Pumroys from penalties for their timber donation. The Pumroys' timber donation deduction was negligent, and they are liable for an accuracy-related penalty under section 6662(b)(1). If the math works out, the Pumroys would in the alternative be liable for the penalty under section 6662(b)(2).

    C.    <u>Section 6662(h)</u>

        1.    <u>Whether Section 6662(h) Applies</u>

Section 6662(h) increases the penalty under section 6662(a) to 40% to the extent an underpayment is attributable to a "gross valuation misstatement." But here we denied the entire deduction because the extinguishment-proceeds clause in the deed did not track the regulation. This made us ponder--if an underpayment is attributable to one reason, can a penalty be applied for a completely separate reason?

As it turns out, the answer is yes. We start as always with the text of the Code--section 6662(h)(1) requires that the underpayment be "attributable to" a gross valuation misstatement. So on first glance it might appear that no section 6662(h) penalty should apply since the underpayment was attributable to failure to donate a conservation easement in perpetuity--not because a portion of the

**[\*41]** deduction reflected a gross misvaluation.[22]  The law has shifted here, and we now know that an overvaluation penalty can apply even if an underpayment is caused by a reason distinct from overvaluation.  RERI Holdings I, LLC v. Commissioner, 149 T.C. 1, 21-24 (2017), aff'd, 924 F.3d 1261 (D.C. Cir. 2019); see also PBBM-Rose Hill, 900 F.3d at 214-15.

These penalties are in play.

### 2.    The Proper Value

Although we already know the amount of the deductions the partners are going to get--zero--we must still figure out the actual value of the donation so that we can decide whether they grossly misvalued it.[23]

Under section 170, an easement's value is the FMV of the perpetual conservation restriction at the time of its contribution.  Sec. 1.170A-14(h)(3)(i),

---

[22] This is what we held in Todd v. Commissioner, 89 T.C. 912, 913-15, 920-21 (1987), aff'd, 862 F.2d 540 (5th Cir. 1988), overruled by AHG Invests., LLC v. Commissioner, 140 T.C. 73, 83 (2013).  (The Fifth Circuit has also overruled its own opinion in Todd.  See PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 214-15 (5th Cir. 2018).)

[23] The Pension Protection Act eliminated the reasonable-cause-and-good-faith defense for gross-misvaluation penalties for years after Burning Bush donated its easement.  See Pension Protection Act of 2006, sec. 1219(a)(3), 120 Stat. at 1084.  Even before its elimination, the reasonable-cause-and-good-faith defense for misvaluation penalties differed from the reasonable-cause-and-good faith defense for negligence and substantial-understatement penalties.  See sec. 6664(c)(2).

[*42] Income Tax Regs.; see also sec. 1.170A-1(c)(1), Income Tax Regs.; sec. 1.170A-7(c), Income Tax Regs. FMV is the price at which the property would change hands "between a willing buyer and a willing seller." Sec. 1.170A-1(c)(2), Income Tax Regs. To determine the FMV, the regulations require us to first try to use the sales of easements comparable to the donated easement--if there is a substantial record of such sales. Sec. 1.170A-14(h)(3)(i), Income Tax Regs. Both parties agree there is no substantial record of sales of comparable conservation easements. If there is no substantial record of comparable easement sales, an easement's FMV is "the difference between the [FMV] of the property it encumbers before the granting of the restriction and the [FMV] of the encumbered property"--also known as the before-and-after test. Id. We must consider the property's highest and best use before and after the easement's creation. See sec. 1.170A-14(h)(3)(ii); Hilborn v. Commissioner, 85 T.C. 677, 689-90 (1985).

This means we must:

- first determine the highest and best use of the property at issue before the donation;

- determine the FMV of the property based on that use;

- determine the highest and best use of the property after the donation;

- determine the FMV of the property based on that use; and

**[*43]** ●      compare the before and after values to determine the FMV of the conservation easement.

The following chart summarizes each party's position:

| Party | Best use before | Best use after | FMV before | FMV after | FMV of easement |
|---|---|---|---|---|---|
| Petitioners (on return) | 214 single-family homes | Hold for speculation | $5,845,000 | $450,000 | $5,395,000 |
| Petitioners (at trial) | 218 residential lots | Hold for speculation | 3,250,000 | 235,000 | 3,015,000 |
| Comm'r | Hold for speculation | Hold for speculation | 1,280,000 | 350,000 | 930,000 |

a.     Before Best Use

The central point in this valuation dispute is the property's best use before the easement. The partners argue that the best use was to develop the property into a 218-lot residential subdivision. The Commissioner argues that residential development would've been a money loser, which means that the best use of the land was to hold it for speculation. The parties used both the income approach-- specifically the discounted cashflow (DCF) method--and the sales-comparison approach. We will first address the parties' DCF analyses.

A DCF analysis projects a property's future cashflow and then discounts it back to present value. See, e.g., Heck v. Commissioner, T.C. Memo. 2002-34.

[*44] Burning Bush's expert called for the development of a 218-lot subdivision. His plan has some severe problems. Several of the lots--specifically lots 1, 193, 194, 201, 203, 205, 206, 207, 208--would be located in a flood plain, and building on them it would violate county regulations.[24] See Calhoun County Subdivision Regs. secs. 5-2-1, 5-6(7), 5-7 (Jan. 20, 1999). Other lots near the proposed cul-de-sacs named Aaron Way, Miriam Pass, and Levi Lane--specifically lots 13A, 117, 118, 119, 129, 130, 156, 157, 160, 184, and 185--would be partly located in a proposed water feature with the even more excellent name of Lake Meribah.[25] The plan would also build town homes--on lots 60-89 and 93-114--located on plots that under county and state regulations are too small (roughly 7,500 square feet) for a septic system. Calhoun County Subdivision Regs. sec. 5-6(2) (Jan. 20,

---

[24] The parties agreed that Calhoun County's regulations applied at the time of donation. They did argue about whether the city of Oxford could annex the property if it were developed as a subdivision, and thus seemed to disagree whether county or city regulations would apply to the property. We heard credible testimony that a developer would likely try to get the property annexed, but no witness said that annexation is automatic. All three experts assumed that Calhoun County regulations would apply, and on balance we find it more likely than not that this property should not be valued as if it were already within Oxford.

[25] All of which are far removed from Jethro Pass, which returns to the country surrounding the hypothetical subdivision in its own way. See Exodus 18:27. Though some of these plots are only partly underwater, county regulations don't allow lots to be more than 25% under water, Calhoun County Subdivision Regs. sec. 5-6(8) (Jan. 20, 1999), a limitation that, by looking at Burning Bush's expert's report, would affect at least some of them.

**[*45]** 1999); Ala. Admin. Code r. 420-3-1-.14(1) (Jan. 21, 2000) (requiring minimum lot size for one septic system be 15,000 square feet). This is important because the imagined subdivision is so remote that it would require septic systems.

We also find that Burning Bush's expert used construction costs in his analysis that he failed to substantiate and are much too low. He projected total construction costs of $3,051,000 or $180 per linear foot. He based this on the costs of an unrelated subdivision in North Georgia and his general expertise. His position suffered on cross-examination when he was unable to give a dollar-by-dollar breakdown or even a general budget. This lack of any sort of concrete detail leads us to find this part of his opinion unreliable.

The Commissioner's expert analysis was not much better on this point. Though that expert's plan itself is more sound--166 buildable lots in three phases--we find that his costs were grossly *over*stated. The problem was his source--the Alabama Department of Transportation (DOT). As we learned from credible testimony at trial, comparing DOT costs to costs of building a subdivision is not at all reasonable. DOT requires materials whose costs are much higher than those used in residential construction, and DOT has building specifications that a normal subdivision would not require. We find that the result is a gross overestimate of the cost associated with a potential subdivision on Burning Bush's land.

**[\*46]** That expert also had some math problems. He recognized one math error in his report the day before trial that changed his valuation by more than $1.3 million. Then, after skillful cross-examination got him to assert that he was "confident" after finding that mistake, it turned out that he had understated revenue by $700,000 because of another basic math error. And that wasn't the only one. Such errors harm credibility. See Boltar, LLC v. Commissioner, 136 T.C. 326, 338-39 (2011); Estate of Bell v. Commissioner, T.C. Memo. 1987-576, 54 T.C.M. (CCH) 1123, 1125-26 (1987) (finding an expert report riddled with math errors was not credible).

We disregard both experts' DCF analyses.

That leaves us with a sales-comparison approach, which we favor anyway when we decide valuation cases, see Pittsburgh Terminal Corp. v. Commissioner, 60 T.C. 80, 89-90 (1973), aff'd, 500 F.2d 1400 (3d Cir. 1974), especially when the alternative is a DCF analysis of an asset with no history of earnings, see Duncan Indus., Inc. v. Commissioner, 73 T.C. 266, 280 n.13 (1979). A sales-comparison analysis generally works by identifying comparable market transactions and adjusting their value for differences of market conditions, size, location, physical features, and other factors. Wortmann v. Commissioner, T.C. Memo. 2005-227, 90 T.C.M. (CCH) 336, 340-41 (2005). Both experts here analyzed comparable

[*47] sales to figure out the "before value" of the property. They were far apart--Burning Bush's expert calculated a value of $3,075,000; the Commissioner's calculated one of $1,280,000. Their difference derives from looking at very different types of land--the Commissioner's expert used transactions for land held for speculative investment, while Burning Bush's expert used transactions for land bought for development.

We find the key difference between the choice of comparables to be the experts' differing views of what the highest and best use of the property was before Burning Bush encumbered it with an easement. We find that a dense residential development of the sort both experts used in their DCF analyses was not financially feasible. But the alternative to this is not necessarily to hold the land for speculation. The Commissioner's expert noted in his report that the real-estate market in the area was good at the end of 2003, and he concluded "that the highest and best use analysis must consider future single-family residential development of the property." He reasonably concluded that if a dense residential development didn't make sense economically, "there appears to have been a niche market for upper end homes with views but without a golf course."

Burning Bush's expert made a similar observation in his report. And he reported that a new road that was imminently to be built as of late 2003 would

[*48] increase access south of I-20 near the property. We find that Burning Bush's expert was more reasonable in concluding that residential development was the highest and best "before" use, even if only less dense residential development. That leads us to conclude that his choice of "before" comparables-- sales of raw land suitable for residential development--is more reasonable than the Commissioner's expert's choice of land held only for speculation.

Burning Bush's expert selected five different plots of land that, in his view, are comparable to Burning Bush's property:

| Sale | Price per acre |
|------|----------------|
| 1 | $25,226 |
| 2 | 12,177 |
| 3 | 11,000 |
| 4 | 11,086 |
| 5 | 10,500 |

He then adjusted these values for their superior and inferior characteristics, compared to Burning Bush's property. As adjusted:

**[*49]**

| Sale | Price per acre |
|------|----------------|
| 1 | $20,000 |
| 2 | 12,700 |
| 3 | 13,400 |
| 4 | 12,600 |
| 5 | 11,500 |

Based on these values, he concluded that Burning Bush's property was worth $13,000/acre. As Burning Bush's property was 236.51 acres, he determined the rounded value was $3,075,000.

We agree that some adjustments are needed to address both the superior and inferior characteristics of these properties. We find, however, that Burning Bush's adjustments are excessive. We agree that the topography of these comparables is inferior to Burning Bush's property--most of them are flatter and lack the views that Burning Bush's property has. But the comparable properties are also superior to the Burning Bush property in some ways. Sale 2 was by the government, potentially inflating the price, and also had good access and exposure. Sale 3 had foreseeably great access beginning in 2004 and is smaller in size. Sale 4 had superior exposure. Sale 5 was purchased by a locality, possibly inflating the price, and had good access and exposure.

[*50] We also find that two of the comparables need a bit more adjustment. The price per acre for Sales 2 and 3 excludes a flood plain from the total acreage. This drives up the price per acre.[26] This would be okay, except that Burning Bush applied the average price per acre to the entire Burning Bush property--including the part of that property that was in a flood plain. We will adjust Sales 2 and 3 back to their total acreage, which lowers the average price per acre for those properties:

| Sale | Price per acre | Total Adjustment |
|------|----------------|------------------|
| 1 | $25,000 | -0- |
| 2 | 11,266 | ($734) |
| 3 | 9,095 | (1,905) |
| 4 | 11,000 | -0- |
| 5 | 10,500 | -0- |

Sale 1 appears to be an outlier, but its description explains why--the tract was vastly superior in quality. It has good access and exposure, located only three miles from I-20. It is smaller, is a higher density development, and has commercial frontage. All of these superior qualities as well as the substantially

---

[26] For example, if 100 acres sold for $100, the average price per acre is $1. But if 30 acres were in a flood plain, the price per acre of usable land would be $1.42.

[*51] higher price per acre than the other comparable land sales, indicate that the Sale 1 property isn't comparable to the Burning Bush property--we will disregard it. After we dismiss Sale 1, the average price per acre comes out to be $10,465. For the reasons we've stated, we do find that there should be a slight upward adjustment for Burning Bush's superior characteristics, and find that a reasonable price per acre is $11,000.

This makes Burning Bush's property's before value $2,601,610.[27]

### b. "After" Best Use

The parties agree that the best use for the Burning Bush property after the donation is speculation or recreation. Burning Bush's expert valued the land in this use at $235,000. The Commissioner's expert valued the land at $350,000. All of the Commissioner's comparable properties were in Alabama, and most of them were mountainous. Burning Bush's expert on the other hand used properties located all over the Southeast, with only one of his comparables in Alabama. One of his comparables was sold two years after the year of the easement; one was sold back in 1998; another one was more than 4 times the size of the Burning Bush property while yet another was more than 13 times larger. We find the Commissioner's expert both reliable and more reasonable.

---

[27] $11,000 x 236.51 = $2,601,610.

[*52]              c.       Conservation Easement Value and Penalty

The following table summarizes our before and after values:

| Before best use value | $2,600,000 |
|---|---|
| After best use value | 350,000 |

With these values now determined, we can calculate that the conservation easement donated had an FMV of $2,250,000.[28]

But $5,395,000 isn't 400% of $2,250,000, so no gross-misvaluation penalty applies.  The partners did report a value for the easement that is more than 200% of the correct value, but a penalty is barred by section 6751(b).  See supra pp. 27-35.

What this all means is that Burning Bush's partners won't get their deductions, but procedural mistakes, a reasonable-cause defense, and an initial deduction that wasn't too high mean that--at least for the all but a tiny sliver of a penalty against the Pumroys--"[t]he depths have covered them; they sank into the bottom as a stone."  Exodus 15:5.

                                        Decisions will be entered under

                                        Rule 155.

---

[28] $2,600,000 − $350,000 = $2,250,000.